# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 29, 2011 Session

## STATE OF TENNESSEE v. JONATHAN RAY SWANNER

### Appeal from the Criminal Court for Knox County
### No. 88470    Richard Baumgartner, Judge

---

### No. E2010-00956-CCA-R3-CD - Filed November 14, 2011

---

A Knox County Criminal Court jury convicted the defendant, Jonathan Ray Swanner, of three counts of rape of a child, *see* T.C.A. § 39-13-522 (2006), and one count of aggravated sexual battery, *see id.* § 39-13-504(a)(4).  The trial court imposed sentences of 24 years' incarceration for each rape of a child conviction and 11 years' incarceration for the aggravated sexual battery conviction, to be served concurrently at 100 percent.  In addition to challenging the sufficiency of the evidence on appeal, the defendant contends that the trial court's ruling that the defendant could not testify about the victim's prior allegation of molestation resulted in a denial of the defendant's right to testify; that the trial court erred by allowing the State to use leading questions in its direct examination of the victim; that the trial court erred by allowing the State to introduce extrinsic evidence of a prior inconsistent statement to impeach the victim; that the State violated the rules of discovery by not disclosing the victim's statement prior to trial; and that the trial court erred by not giving a limiting jury instruction regarding prior inconsistent statements.  Discerning no error, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined, and J.C. MCLIN, J., mortuus.[1]

John M. Boucher, Jr.(at motion for new trial and on appeal); Joseph Liddell Kirk and Steven Edward Sams (at trial), Knoxville, Tennessee, for the appellant, Jonathan Ray Swanner.

---

[1] This case was originally assigned to our colleague and friend, Judge J.C. McLin.  After Judge McLin's untimely death on September 3, 2011, the case was re-assigned.  Prior to his death, Judge McLin and his staff had done extensive work on this case.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Charme Knight, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Knox County grand jury charged the defendant with three counts of rape of a child and two counts of aggravated sexual battery for acts committed against the victim, his niece – A.R.D., a child under the age of thirteen.[2] The indictment alleged the acts occurred "on or about the __ day of February, 2007." The indictment alleged five separate acts as follows:

> count one: rape of a child (cunnilingus)
> count two: rape of a child (digital penetration)
> count three: rape of a child (fellatio)
> count four: aggravated sexual battery (defendant's penis touched victim's vagina)
> count five: aggravated sexual battery (defendant's penis touched by victim's hand)

The victim, who was five-years-old at the time of trial but four-years-old when the incidents occurred, indicated on drawings the locations of both a girl's and a boy's "private part[s]" and indicated that "private parts" are located in the "front" and the "back." She testified that the defendant gave her a "bad touch" when she was at her grandmother's house. The victim said that she was on the couch asleep and that the defendant was on the floor when the touching occurred. She explained that a "bad touch" is when someone touches another's "private part." The victim testified that the defendant touched her "front private part" with his finger. She testified that the defendant touched the "outside" of her "private part," but she later testified that the defendant's finger did touch the "inside" of her "private part." The victim shook her head "no" when asked if the defendant touched her with his mouth or tongue. She also shook her head "no" when asked if the defendant touched her with "something else besides his finger." The victim testified that the defendant did not touch her "private part" with "his private part." She also denied seeing the defendant's "private part" or the defendant's having her touch his "private part." The victim denied spitting anything on to the living room table or wiping the table. At this point during the victim's testimony, the prosecutor indicated a need to question the victim concerning her prior statement to the police made the day after the incident.

---

[2] The record reflects the victim's date of birth is August 22, 2002. As is the practice of this court, we will refer to the victim by her initials.

-2-

The State then questioned the victim, without objection, regarding the victim's statement to the police made the day after the incident. The victim remembered talking to the police when the incidents occurred. She acknowledged that she told the police "that [the defendant] had licked [her] monkey." The victim recalled telling the police that the defendant "took his weenie out and put it in [her] mouth." She affirmed that, when the defendant did that, "pee came out of [the defendant's] weenie and went in [her] mouth." She testified that she spit out the "pee" onto a table and wiped it up with a paper towel that she threw into the garbage. The victim denied telling the police that the defendant "put his weenie in [her] hand." She acknowledged telling the police that the defendant "had put his weenie on [her] monkey." The victim testified that the defendant had in fact done these things and that she did not say so initially during her testimony because the defendant was in the courtroom.

Tammy Stewart, the victim's grandmother and the defendant's mother, testified that Bridget Truxillo, the victim's mother and Ms. Stewart's daughter, brought the victim to Ms. Stewart's home to spend the night on Friday, February 16, 2007. The next day, the victim played inside Ms. Stewart's home most of the day. At 8:30 that evening, the defendant took the victim to the home of family friends, the Caldwells, to play with children there. Ms. Truxillo brought her other daughter to Ms. Stewart's house that evening to spend the night. Ms. Stewart testified that the defendant and the victim walked back from the Caldwells' home at 10:00 p.m.. When Ms. Stewart and the victim's sister went to bed between 10:30 p.m. and 11:00 p.m., the victim had already fallen asleep on the love seat in the living room. Ms. Stewart said that the defendant was sitting in an arm chair in the living room when she went to bed.

Ms. Stewart testified that the defendant was still in the living room arm chair when she awoke the next morning. While she was cooking breakfast, the victim came to her and said that she needed to tell her something. Ms. Stewart telephoned Ms. Truxillo to inform her of the victim's report, and Ms. Truxillo telephoned the police. Ms. Truxillo arrived at Ms. Stewart's home with the police approximately 30 minutes after Ms. Stewart's call. Ms. Stewart identified at trial the pajamas that the victim wore on February 17.

Ms. Stewart testified that the defendant had gone to the Caldwells' home earlier that morning. When he returned, the defendant apparently saw the police and fled to the Caldwells' home. Ms. Stewart spoke to the defendant "[a] couple of days later" and "told him that the law was looking for him." The defendant told Ms. Stewart that the accusations made by the victim were lies. Ms. Stewart testified that the police found the defendant underneath her house two days later.

Bridget Truxillo, the victim's mother and the defendant's sister, testified that the victim spent the night at Ms. Stewart's home on February 16. On February 17, Ms. Truxillo took her other daughter to Ms. Stewart's home. When she arrived, the defendant and the victim were at the Caldwells' home. She drove to the Caldwells' home and returned to Ms. Stewart's home with the victim because it was cold outside and she did not want the victim to walk home.

Ms. Truxillo testified that Ms. Stewart telephoned her the next morning and informed her of the victim's report. Ms. Truxillo then called the police to report that the defendant had molested her daughter. She accompanied the police to Ms. Stewart's home. Ms. Truxillo testified that when she asked the victim if the defendant had hurt her, the victim began crying and said that he had. The police collected the victim's pajamas as evidence, and Ms. Truxillo took the victim to East Tennessee Children's Hospital (ETCH), where a doctor "examined [the victim's] vagina and took swabs of her front and her back."

Knox County Sheriff's Office (KCSO) Lieutenant Jeanette Harris responded to Ms. Truxillo's report and went to Ms. Stewart's home. At Ms. Stewart's home, she interviewed both Ms. Truxillo and Ms. Stewart. With the assistance of a Department of Children's Services (DCS) investigator, she also interviewed the victim. Lieutenant Harris collected the victim's pajamas as evidence. The police found the defendant hiding under Ms. Stewart's home on February 19. Lieutenant Harris interviewed the defendant, who denied molesting the victim. She collected a buccal swab from the defendant, which she forwarded to the crime scene unit for analysis.

ETCH Doctor Kenneth Wicker performed a rape kit examination of the victim. His examination revealed no evidence of trauma to the victim's genitalia. Likewise, the victim's hymen showed no evidence of penetration. These findings were consistent with the victim's report that the defendant had licked her vagina and placed his finger in her vagina. Doctor Wicker collected vaginal and anal swabs from the victim, which were submitted to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis.

KCSO Lieutenant Terry Lee testified that he was the supervisor of the forensic services division. He responded to the scene at Ms. Stewart's house on February 18, 2007. He collected a swab from a smear on the table in the living room, a blanket, napkins found in a trash bag, the trash bag, and clothing. Lieutenant Lee submitted these items, along with the defendant's buccal swab collected by Lieutenant Harris, to the TBI Crime Lab for analysis.

TBI Special Agent Jennifer Millsaps, a forensic scientist, analyzed the swabs collected from the victim for the presence of semen and alpha amylase, a component of

-4-

saliva. She found "a limited number of spermatozoa" on the victim's vaginal swab. Special Agent Millsaps testified that the number of spermatozoa was too low to create a deoxyribonucleic acid (DNA) profile. As a result, the only DNA profile obtained from the victim's vaginal swab was that of the victim. In addition to the evidence of semen found on the victim's vaginal swab, Special Agent Millsaps' testing also revealed the presence of alpha amylase on the vaginal swab. Special Agent Millsaps tested the victim's anal swabs and found spermatozoa, but the spermatozoa were also too few in number or too degraded to obtain a DNA profile. Special Agent Millsaps did not find the presence of semen on the victim's panties. She did, however, identify semen on the victim's pajama bottoms and obtained a partial DNA profile consistent with the defendant's from testing performed on the pajamas.

At the conclusion of the State's proof, the defendant moved for judgments of acquittal. The trial court dismissed the aggravated sexual battery charge alleged in count five, ruling that "there was no evidence of that" based upon the victim's denial that the defendant had her touch his penis during the incident. After being apprised of prior convictions that the trial court deemed admissible as impeachment in the event the defendant chose to testify, the defendant elected not to testify and did not present any additional proof. The jury convicted the defendant, as charged, of three counts of rape of a child and one count of aggravated sexual battery. At sentencing, the trial court imposed an effective sentence of 24 years' incarceration to be served at 100 percent.

*Sufficiency of the Evidence*

The defendant contends that the evidence was insufficient to sustain his convictions. He claims that the victim recanted her allegations at trial and that her prior inconsistent statement made to the police cannot be used as substantive evidence. The State argues that no extrinsic evidence of an inconsistent statement was admitted at trial because the victim adopted her statement and testified to the facts contained within the statement at trial. Accordingly, the State argues the evidence is sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* at (2).

The five-year-old victim testified that the defendant gave her a "bad touch." She testified that the defendant put his finger "inside [her] front private part." In addition to this incident of digital penetration, the victim also acknowledged the truthfulness of her prior statement to the police wherein she detailed other acts committed by the defendant. The victim testified at trial that these acts occurred. She specifically said that the defendant placed his penis in her mouth (rape of a child - fellatio), placed his mouth and tongue on her genitalia (rape of a child - cunnilingus), and touched her genitalia with his penis (aggravated sexual battery). Special Agent Millsaps' testing revealed the presence of spermatozoa on the victim's vaginal and anal swabs, as well as her pajamas. Her testing also revealed the presence of alpha amylase on the victim's vaginal swab. Special Agent Millsaps obtained a partial DNA profile from the semen on the victim's pajamas that was consistent with the defendant's DNA. We hold that the evidence was legally sufficient to support the defendant's convictions of three counts of rape of child and one count of aggravated sexual battery.

The defendant argues that the trial court committed plain error by not allowing him to testify about the allegedly false accusations previously made by the victim. He argues that the court made inappropriate comments about the defendant's credibility and that the credibility of a witness was a matter for the jury's determination. The State responds that the defendant has changed theories on appeal and has, therefore, waived the issue.

The record reflects that the defendant filed a pretrial motion seeking to introduce evidence of allegations of sexual molestation made by the victim against other individuals. During the pretrial hearing on the motion, the defendant testified that in May 2006,[3] he heard the victim tell Ms. Truxillo, in response to Ms. Truxillo's questioning, that the victim's five-year-old brother, her father, and her paternal grandfather had "licked her." Defense counsel argued that the court should allow the defendant's testimony pursuant Tennessee Rule of Evidence 412 to explain the victim's knowledge about sexual matters. *See* Tenn. R. Evid. 412(c)(4)(ii) (evidence of a victim's specific instances of conduct with someone other than the defendant may be admissible "to prove or explain . . . knowledge of sexual matters"). The court excluded the testimony, ruling that it lacked credibility. Following the conclusion of the State's proof at trial, the trial court discussed with the defendant his right to testify and the admissibility of several prior theft convictions bearing upon the defendant's credibility. After a brief recess to consider whether to testify, the defendant elected not to testify and presented no further proof. The defendant did not argue at any time before the trial court that the exclusion of the victim's prior sexual abuse allegation resulted in a denial of his right to testify. On appeal, the defendant for the first time contends that the victim's prior allegations were false and that the trial court's exclusion of the evidence violated his right to testify.

In our view, the trial court conducted an appropriate analysis of this evidence pursuant to Rule 412, which is how it was proffered to the trial court. Also, we cannot discern how the trial court's exclusion of this evidence precluded the defendant from testifying later at trial. The record does not reflect that the defendant was denied his right to testify by this evidentiary exclusion. Rather, the record reveals that the defendant decided not to testify based upon his own consideration of the pitfalls of facing impeachment by his prior convictions.

---

[3] The victim was three years old at the time this accusation was allegedly made.

Furthermore, because the defendant has changed his theory on appeal, we agree with the State that this issue is waived. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001); *State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). To the extent that the defendant attempts to raise this issue for our review via plain error, *see* Tenn. R. App. P. 36(b), we have considered whether the issue merits treatment as plain error and determine that consideration of this issue is not necessary to do substantial justice.

*Victim's Testimony*

The defendant makes four distinct allegations concerning the victim's testimony at trial. First, the defendant challenges the trial court's decision to allow the use of leading questions by the prosecutor during the direct examination of the victim. Tennessee Rule of Evidence 611 vests the trial court with wide discretion in controlling the presentation of evidence, which includes the use of leading questions on direct examination to develop a witness's testimony. We review this decision under an abuse of discretion standard. *See State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993).

Trial courts may permit leading questions of child sex offense victims on direct examination when necessary to fully develop the witness's testimony. *Swafford v. State*, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975); *see also* Tenn. R. Evid. 611(c)(1) ("Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony.")

The record establishes that the questions were intended to develop the testimony of the child victim. The victim, who was five-years-old at the time of trial, clearly had difficulty answering questions, often answering by moving her head or with one word. She began denying that certain things occurred, but she later explained that she was hesitant to talk with the defendant in the courtroom. The questions asked by the prosecutor were in no way suggestive. Accordingly, the trial court did not abuse its discretion by permitting the prosecutor to use leading questions during the direct examination of the victim.

The defendant also argues that the trial court erred by allowing the State to introduce extrinsic evidence of the victim's prior statement to investigators. The defendant contends that the State committed a discovery violation by not providing the defense with the statement prior to trial and that the trial court erred by not giving the jury a limiting instruction regarding the use of prior inconsistent statements. The State responds that the court did not admit extrinsic evidence of a prior inconsistent statement, that pretrial discovery

of the victim's statement was not required, and that no need existed for a jury instruction concerning prior inconsistent statements.

The record shows that during the victim's testimony, the parties held a bench conference to discuss the State's questioning the victim concerning her prior statement to investigators in which she detailed the sexual acts committed by the defendant. After a brief recess to allow the defendant an opportunity to listen to the victim's recorded statement, the trial reconvened with the prosecutor's asking the victim whether she remembered giving a statement to the police. The victim responded that she remembered giving a detailed statement to the police and that what she had told the police immediately after the offense was the truth. The victim then testified regarding several discrete acts committed by the defendant during the incident.

"A witness's prior inconsistent statement may be used to impeach the witness." *State v. Philpott*, 882 S.W.2d 394, 406 (Tenn. Crim. App. 1994). Tennessee Rule of Evidence 613(b) further provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same." The Tennessee Supreme Court has held that evidence of a prior inconsistent statement is not admissible unless the witness "either denies or equivocates to having made the prior inconsistent statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). If a witness unequivocally admits making the prior statement, then extrinsic evidence of the statement becomes "both cumulative and consistent with a statement made by the witness[] during trial." *Id.*

In this case, the victim unequivocally admitted making the prior statement, and the State never introduced extrinsic evidence of the statement. Accordingly, the defendant's assignment of error regarding extrinsic evidence is without merit. Furthermore, because no extrinsic evidence of the victim's prior statement was introduced at trial, the trial court had no reason to instruct the jury regarding prior inconsistent statements.

As for the alleged violation of Tennessee Rule of Criminal Procedure 16, the rule specifically excludes State witnesses' statements from Rule 16 discovery. Tenn. R. Crim. P. 16(a)(2) (Rule 16 does not "authorize discovery of statements made by [S]tate witnesses."). The State was not obligated to disclose the statement prior to trial; therefore, the defendant's argument via Rule 16 fails.

*Conclusion*

Discerning no error, we affirm the judgments of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE